UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

THE GAMEOLOGIST GROUP, LLC,

                Plaintiff,           09 Civ. 6261 (JGK)

       - against -             OPINION AND ORDER

SCIENTIFIC GAMES INTERNATIONAL,
INC., and SCIENTIFIC GAMES
CORPORATION, INC.,

                Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

     This is a case about "bling" – "BLING BLING 2002," "Spring Bling," "Bling Me the Money," and "It's a Bling Thing" – to name a few variations.  The plaintiff has a trademark registration for "BLING BLING 2002" for "entertainment in the nature of online three dice casino games" and for "casino games and equipment therefor, namely board games."  The plaintiff alleges that the defendants have infringed its trademark rights and otherwise violated its rights under federal and state law because the defendants have marketed lottery tickets to state lottery commissions and the lottery tickets incorporate various uses of the term "bling."  The plaintiff's claims take "bling" too far.

     The plaintiff, the Gameologist Group, LLC ("Gameologist" or "the plaintiff"), brings this action against Scientific Games International, Inc. and Scientific Games Corporation, Inc.

("Scientific" or "the defendants").  The plaintiff alleges
claims of trademark infringement, false designation of origin
and unfair competition, and false advertising under the Lanham
Act, 15 U.S.C. § 1051 et seq.  The plaintiff also alleges claims
under New York common law for unfair competition, passing off,
breach of contract, unjust enrichment, and quantum meruit.

     The defendants now move pursuant to Rule 56 of the Federal
Rules of Civil Procedure for summary judgment dismissing all
causes of action in this suit.


                              I.

     The standard for granting summary judgment is well
established.  "The court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs.,
Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial
court's task at the summary judgment motion stage of the
litigation is carefully limited to discerning whether there are
any genuine issues of material fact to be tried, not to deciding
them.  Its duty, in short, is confined at this point to issue-
finding; it does not extend to issue-resolution."  Gallo, 22
F.3d at 1224.  The moving party bears the initial burden of

"informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Behringer v. Lavelle Sch. for the Blind, No. 08 Civ. 4899, 2010 WL 5158644, at *1 (S.D.N.Y. Dec. 17, 2010).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993);

see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998)

(collecting cases); Behringer, 2010 WL 5158644, at *1.


## II.

The following facts are undisputed unless otherwise noted.


### A.

In 1998, Jeffrey McGill ("McGill"), a slot machine

technician from Atlantic City, New Jersey, developed a concept

for a casino table game, which he decided to name "Bling Bling."

(Defs.' 56.1 Stmt. ¶¶ 3-4; Pl.'s Am. Resp. to Defs.' 56.1 Stmt.

("Pl.'s 56.1 Stmt.") ¶¶ 3-4.)  McGill testified that he chose

the name because "it was [a] new song out and it was at the top

of the charts and everybody was going crazy.  And I knew.  If a

casino game was named Bling Bling, forget about it."  (Decl. of

John Balestriere in Opp'n to Defs.' Mot. for Summ. J.

("Balestriere Decl.") Ex. G; Decl. of Peter S. Sloane, Esq. in

Supp. of Defs.' Mot. for Summ. J. ("Sloane Decl.") Ex. 1

("McGill Dep.") 28.)  "Bling" is a term popularized in the hip-

hop music community and is frequently used in advertisements and

pop culture.  (Defs.' 56.1 Stmt. ¶ 6; Pl.'s 56.1 Stmt. ¶ 6;

Sloane Decl. Ex. 3.)

B.

On January 7, 2003, McGill filed an intent-to-use ("ITU")
application with the U.S. Patent and Trademark Office ("USPTO")
which sought to register the mark "BLING BLING 2002" for
entertainment services in Class 41 ("the first ITU"). (Defs.'
56.1 Stmt. ¶ 9; Pl.'s 56.1 Stmt. ¶ 9; Sloane Decl. Ex. 5;
Balestriere Decl. Ex. C.)  On January 12, 2005, McGill executed
a Statement of Use for this ITU stating that the mark was used
in commerce for online three-dice casino games no later than
December 22, 2004.  (Defs.' 56.1 Stmt. ¶ 20; Pl.'s 56.1 Stmt. ¶
20; Sloane Decl. Ex. 5; Balestriere Decl. Ex. C.)  On May 17,
2005, the USPTO issued U.S. Registration No. 2,953,204 for the
mark "BLING BLING 2002" for "entertainment in the nature of
online three dice casino games" (the "2005 registration").
(Defs.' 56.1 Stmt. ¶ 27; Pl.'s 56.1 Stmt. ¶ 27; Sloane Decl. Ex.
14; Balestriere Decl. Ex. D.)

On October 9, 2003, McGill filed a second ITU application
with the USPTO to register the mark "BLING BLING 2002" for goods
in Class 9 and Class 28 ("the second ITU").  (Defs.' 56.1 Stmt.
¶ 12; Pl.'s 56.1 Stmt. ¶ 12; Sloane Decl. Ex. 7; Balestriere
Decl. Ex. A.)  In Class 9, the application sought to register
the mark for gaming equipment such as slot machines and
computerized video games. (Defs.' 56.1 Stmt. ¶ 12; Pl.'s 56.1
Stmt. ¶ 12.)  In Class 28, the application sought to register

the mark for "casino games and equipment therefor," specifying products such as board games and lottery cards. (Defs.' 56.1 Stmt. ¶ 12; Pl.'s 56.1 Stmt. ¶ 12.)  On July 22, 2010, Gameologist filed a request with the USPTO to divide this ITU, specifying that "casino games and equipment therefor, namely, board games" were now in use and requesting to divide out into the child application all goods in Class 9 and the remaining goods in Class 28. (Defs.' 56.1 Stmt. ¶ 60; Pl.'s 56.1 Stmt. ¶ 60; Sloane Decl. Ex. 7.)  On September 28, 2010, the USPTO issued U.S. Registration No. 3,855,103 for the mark "BLING BLING 2002" as applied to "casino games and equipment therefor, namely, board games" (the "2010 registration").  (Defs.' 56.1 Stmt. ¶ 61; Pl.'s 56.1 Stmt. ¶ 61; Sloane Decl. Ex. 26; Balestriere Decl. Ex. B.)  No registration has issued for the plaintiff's mark as applies to the remaining goods listed in the application for the second ITU, including lottery cards. (Defs.' 56.1 Stmt. ¶ 62; Pl.'s 56.1 Stmt. ¶ 62.)  The plaintiff has not yet filed a Statement of Use with respect to these remaining goods and has requested several extensions of the deadline for doing so.  (Defs.' 56.1 Stmt. ¶ 62; Pl.'s 56.1 Stmt. ¶ 62; Sloane Decl. Ex. 7.)

C.

On August 28, 2003, McGill, along with six other
individuals, including Joseph Cassarino ("Cassarino"), formed
The Gameologist Group, LLC.  (Defs.' 56.1 Stmt. ¶ 10; Pl.'s 56.1
Stmt. ¶ 10.)  Gameologist sought to develop McGill's "Bling
Bling" concept and several other gaming concepts.  (Defs.' 56.1
Stmt. ¶ 11; Pl.'s 56.1 Stmt. ¶ 11.)  On November 1, 2004, McGill
resigned as Managing Member of Gameologist and divested himself
of his entire ownership interest in the company.  (Defs.' 56.1
Stmt. ¶¶ 13-14; Pl.'s 56.1 Stmt. ¶¶ 13-14.)  Upon McGill's
resignation, Joseph Cassarino became Gameologist's new Managing
Member.  (Defs.' 56.1 Stmt. ¶ 16; Pl.'s 56.1 Stmt. ¶ 16.)

On March 26, 2005, McGill assigned both ITUs for the mark
"BLING BLING 2002" to Gameologist.  (Defs.' 56.1 Stmt. ¶ 24;
Pl.'s 56.1 Stmt. ¶ 24; Sloane Decl. Exs. 10, 11.)  The
assignments were recorded with the USPTO four days later.
(Defs.' 56.1 Stmt. ¶ 26; Pl.'s 56.1 Stmt. ¶ 26; Sloane Decl.
Exs. 12, 13.)  The defendants contend that McGill had no
underlying business or associated good will to assign in
connection with the mark and, in 2010, they filed petitions with
the USPTO to cancel both registrations for the "BLING BLING
2002" mark on the grounds of fraud and abandonment through an
improper assignment in gross.  (Defs.' 56.1 Stmt. ¶¶ 25, 63-64;
Sloane Decl. Exs. 27, 28.)

D.

In 2002, McGill and Cassarino began attempts to license the "BLING BLING 2002" mark to various industries, including the lottery ticket industry. (Defs.' 56.1 Stmt. ¶¶ 37-38; Pl.'s 56.1 Stmt. ¶¶ 37-38.) In October 2002, McGill and Cassarino began discussions with Oberthur Gaming Technologies Corporation ("Oberthur") about licensing the mark in connection with lottery tickets, but Oberthur ultimately declined to enter into a license agreement. (Defs.' 56.1 Stmt. ¶¶ 39-40; Pl.'s 56.1 Stmt. ¶¶ 39-40.)

In October 2003, Gameologist met with representatives of MDI Entertainment, LLC ("MDI") about potentially licensing the "BLING BLING 2002" mark for use in the lottery industry. (Defs.' 56.1 Stmt. ¶ 44; Pl.'s 56.1 Stmt. ¶ 44.) MDI is a company that seeks to obtain licenses to popular entertainment and cultural icons and to develop lottery tickets that incorporate these themes. (Defs.' 56.1 Stmt. ¶ 41; Pl.'s 56.1 Stmt. ¶ 41; Balestriere Decl. Ex. U; Sloane Decl. Ex. 17 ("Saferin Dep.") 13.) MDI and the plaintiff ultimately entered into a license agreement effective December 1, 2003, granting MDI rights to use the plaintiff's mark in connection with lottery tickets. (Defs.' 56.1 Stmt. ¶ 48; Pl.'s 56.1 Stmt. ¶ 48; Sloane Decl. Ex. 20; Balestriere Decl. Ex. H.) At the time of the agreement, MDI had been acquired by defendant Scientific

Games International.[1]  (Defs.' 56.1 Stmt. ¶ 117; Pl.'s 56.1 Stmt.
¶ 117.)

     After MDI and the plaintiff entered into this agreement,
representatives of MDI told McGill that state lotteries were not
interested in the plaintiff's "Bling Bling" lottery concept.
(Balestriere Decl. Ex. F; Sloane Decl. Ex. 2 ("Cassarino Dep.")
241; McGill Dep. 246-48.)  In April 2004, MDI and the plaintiff
agreed to cancel the license agreement.  (Defs.' 56.1 Stmt. ¶
53; Pl.'s 56.1 Stmt. ¶ 53; Sloane Decl. Ex. 22.)  The defendants
assert that the parties mutually agreed that a genuine
commercial reason warranted cancellation of the agreement.
(Defs.' 56.1 Stmt. ¶ 53.)  The plaintiff contends that MDI's
claim that no state lottery commissions were interested in the
plaintiff's mark was a pretext to allow the defendants to use
Gameologist's ideas for their own commercial benefit.  (Pl.'s
56.1 Stmt. ¶¶ 51, 53.)[2]

_____

[1] The parties dispute the exact relationship between MDI and the
defendants.  The defendants assert that MDI is a wholly-owned,
operationally independent subsidiary that was acquired in
January 2003.  (Defs.' 56.1 Stmt. ¶ 43.)  The plaintiff claims
that MDI is not operationally independent and that the
defendants and MDI are essentially the same entity.  (Pl.'s 56.1
Stmt. ¶¶ 43, 118.)  The record indicates that at least some
officers from MDI stayed on and were involved with both
Scientific and MDI after MDI was acquired by Scientific.
(Saferin Dep. 15; Sept. 27, 2011 Hr'g Tr. ("Tr.") 6.)

[2] The defendants also assert that the trademark rights that the
plaintiff purported to license to MDI had been fraudulently
procured from the USPTO because the statement of use associated

In July 2004, following the cancellation of the MDI license agreement, Joseph Cassarino sent a letter to Governor Pataki with a copy to the Director of the New York Lottery suggesting a "Bling Bling" lottery ticket. (Sloane Decl. Ex. 23.)  In the letter, Cassarino sought further information about discussions between the New York Lottery and MDI concerning a "Bling Bling" lottery ticket.  Cassarino explained in the letter that when Gameologist had been in negotiations with MDI, MDI had discovered that the New York Lottery had previously hired MDI to print a "Bling Bling" lottery card and that MDI had told the plaintiff it would inform the New York Lottery that the trademark for "Bling Bling" was owned by the plaintiff. According to Cassarino's letter, the New York Lottery had then rejected the offer to license the "Bling Bling" ticket from MDI, claiming that focus groups did not view the phrase "Bling Bling" favorably.  The letter asked for further explanation of how these events unfolded.  (Sloane Decl. Ex. 23.)

In a response letter to Cassarino, the Director of the New York Lottery explained that the name "Bling Bling" had first been suggested independently of MDI prior to May 2002.  The letter explained that the New York Lottery had asked ticket manufacturer Pollard Banknote Ltd. to produce a prototype of a

---

with the 2005 registration relied upon the posting of the free online slot machine game, which they contend does not constitute a use in commerce.  (Tr. 3.)

"Bling Bling" lottery ticket which was submitted for focus group testing in September 2003.  According to the letter, the results of the focus group testing were negative and the New York Lottery decided not to pursue the concept further.  (Sloane Decl. Ex. 21.)

In July 2008, the plaintiff also contacted the Florida Lottery directly about making a "Bling Bling" lottery ticket. (Defs.' 56.1 Stmt. ¶ 54; Pl.'s 56.1 Stmt. ¶ 54; Sloane Decl. Ex. 24.)  The Florida Lottery rejected this proposal. (Defs.' 56.1 Stmt. ¶ 56; Pl.'s 56.1 Stmt. ¶ 56; Sloane Decl. Ex. 25; Balestriere Decl. Ex. Z.)


E.

The plaintiff has not entered into any license agreement with any party other than MDI for use of its mark in connection with lottery-related goods or any other goods or services. (Defs.' 56.1 Stmt. ¶¶ 57-58; Pl.'s 56.1 Stmt. ¶¶ 57-58; Cassarino Dep. 125.)  The plaintiff has never successfully marketed a "Bling Bling" lottery ticket to a state lottery commission or released a product with the "Bling Bling" mark in the lottery industry.  (Defs.' 56.1 Stmt. ¶ 59; Cassarino Dep. 125-26.)  No lottery ticket featuring the mark "Bling Bling" was released during the course of the plaintiff's license agreement with MDI.  (Defs.' 56.1 Stmt. ¶ 52; Cassarino Dep. 126.)

11

In 2004, Gameologist made available online a slot machine game simulation displaying the mark "BLING BLING 2002." (Defs.' 56.1 Stmt. ¶ 19; Pl.'s 56.1 Stmt. ¶ 19; Sloane Decl. Exs. 5, 9.) The simulation is available free of charge, and Gameologist has not earned any money from the website. (Defs.' 56.1 Stmt. ¶ 22; Pl.'s 56.1 Stmt. ¶ 22.)

In 2006, Gameologist also produced 500 units of a board game bearing the mark "BLING BLING 2002 The TAKEOVER Part I." (Defs.' 56.1 Stmt. ¶ 29; Pl.'s 56.1 Stmt. ¶ 29; Sloane Decl. Ex. 15.) The parties dispute how many units of this board game Gameologist sold. Gameologist's business records indicate the sale of four board games in 2007 at a price of approximately $30 each. (Defs.' 56.1 Stmt. ¶¶ 31-32; Pl.'s 56.1 Stmt. ¶¶ 31-32; Sloane Decl. Ex. 16.) McGill testified that Gameologist sold approximately half of the remaining units to a small group of retailers in unrecorded transactions in cash. (McGill Dep. 153-157.) McGill testified that those units that were not sold were distributed free of charge as promotional items. (McGill Dep. 94, 152.) The board game is the only product that the plaintiff has actually sold featuring the mark "BLING BLING 2002." (Defs.' 56.1 Stmt. ¶¶ 30, 77; Pl.'s 56.1 Stmt. ¶¶ 30, 77.)

F.

The defendants manufacture lottery tickets and provide lottery-related services to state lottery commissions throughout the United States and abroad.  (Defs.' 56.1 Stmt. ¶¶ 65-66; Pl.'s 56.1 Stmt. ¶¶ 65-66.)  The defendants have sold several thousand instant lottery tickets to state lottery commissions that feature the word "bling."  (Defs.' 56.1 Stmt. ¶ 70; Pl.'s 56.1 Stmt. ¶ 70.)  These include a "$50,000 BLING" ticket for the Georgia Lottery, an "IT'S A BLING THING" ticket for the New Hampshire Lottery, a "BLING ME THE MONEY" ticket for the Kentucky Lottery, a "SPRING BLING" ticket for the New Mexico Lottery, and a "$10,000 BLING" ticket for the District of Columbia Lottery.  (Defs.' 56.1 Stmt. ¶ 71; Pl.'s 56.1 Stmt. ¶ 71; Balestriere Decl. Ex. O; Sloane Decl. Ex. 30.)  These tickets were developed and launched between 2007 and 2010, at least three years after the termination of the license agreement between MDI and the plaintiff.  (Defs.' 56.1 Stmt. ¶¶ 72-76; Pl.'s 56.1 Stmt. ¶¶ 72-76.)[3]

---

[3] The plaintiff also asserts that the defendants developed a "Bling Bling" lottery ticket for the Belgium Lottery and pitched a "Bling Bling" lottery concept to the Georgia Lottery.  (Second Am. Compl. ¶ 68; Balestriere Decl. Exs. M, N ("Schoubert Dep.") at 16; O.)  However, counsel for the plaintiff made clear at oral argument that the plaintiff is not bringing a Lanham Act claim based on the Belgian ticket or the proposal to the Georgia Lottery.  (Tr. 14-15, 22.)  In addition, the plaintiff contends that the defendants developed a "Ba-Da-Bling" lottery ticket for the New York Lottery that was very similar to the ticket that

G.

On July 13, 2009, this case was removed to this Court from the New York State Supreme Court, New York County.  The plaintiff filed a motion to remand the case to state court but subsequently withdrew the motion.  A second amended complaint was filed on November 9, 2010.

**III.**

The defendants move for summary judgment dismissing the plaintiff's trademark infringement claim under section 32(1) of the Lanham Act and false designation of origin and unfair competition claim under section 43(a) of the Lanham Act. Section 32(1)(a) of the Lanham Act provides protection against the use in commerce of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" and its application to "labels, signs, prints, packages, wrappers, receptacles or advertisements" where "such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a). Section 43(a)(1)(A) protects both registered and unregistered marks against the use of any word, term, name, symbol or device that "is likely to cause confusion, or to cause mistake, or to

---

was the subject of the MDI license agreement.  (Second Am. Compl. ¶¶ 68, 52-54; Balestriere Decl. Ex. O.)  The "Ba-Da-Bling" ticket is the subject of a separate lawsuit in the New York State Supreme Court.  (Second Am. Compl. ¶ 55.)

deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ."  15 U.S.C. § 1125(a).  Thus,

> [i]n order to succeed a plaintiff does not have to show necessarily that consumers would believe that the defendant's goods or services are from the same source as those of the plaintiff.  A defendant may also be liable . . . where the defendant's actions are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the defendant's goods or services with those of the plaintiff.

Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996) (internal quotation marks and citation omitted).

To establish a trademark infringement claim under either of these provisions, a plaintiff must show both that it has a valid mark that is entitled to protection and that the defendant's actions are likely to cause confusion with the plaintiff's mark. See Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C., 182 F.3d 133, 137 (2d Cir. 1999); Time, Inc. v. Petersen Publ'g Co. L.L.C., 173 F.3d 113, 117 (2d Cir. 1999); Sports Auth., 89 F.3d at 960; Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 292 (S.D.N.Y. 2003).  The defendants argue that the plaintiff has failed to establish either of these elements.

A.

To succeed on a federal claim for trademark infringement, the plaintiff must, as an initial matter, show that it has a valid mark that is entitled to protection.  Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993); Estee Lauder Inc. v. Gap, Inc., 108 F.3d 1503, 1508 (2d Cir. 1997); Sports Auth., 89 F.3d at 960; Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp., 964 F. Supp. 733, 742 (S.D.N.Y. 1997).  According to section 7(b) of the Lanham Act, a certificate of registration of a trade or service mark issued by the USPTO is

> prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate . . . .

15 U.S.C. § 1057(b).  Moreover, if a mark becomes incontestable, its "registration shall be conclusive evidence of the validity of the registered mark and . . . of the registrant's exclusive right to use the registered mark in commerce."  15 U.S.C. § 1115(b).

The plaintiff has obtained federal registration protection for its mark for "entertainment in the nature of online three dice casino games" and for "casino games and equipment therefor, namely, board games."  (Defs.' 56.1 Stmt. ¶¶ 27, 61; Pl.'s 56.1

Stmt. ¶¶ 27, 61; Balestriere Decl. Exs. B, D; Sloane Decl. Exs. 14, 26.).  In addition, the latter mark has become incontestable.  (Balestriere Decl. Ex. E.)  However, the plaintiff claims that the defendants infringed its mark by using the word "bling" in connection with lottery tickets, and the plaintiff owns no registrations for its mark for lottery tickets.[4]  Because "the presumption of an exclusive right to use a registered mark extends only to the goods and services noted in a registration certificate," Caché, Inc. v. M.Z. Berger & Co., No. 99 Civ. 12320, 2001 WL 38283, at *4 (S.D.N.Y. Jan. 16, 2001) (citations omitted), the plaintiff is not entitled to a presumption of an exclusive right to use the "BLING BLING 2002" mark for lottery tickets.[5]  Nor does the incontestable status of

---

[4] While the plaintiff's second ITU application did initially seek to register the mark for Class 28, which includes lottery cards, the plaintiff later filed a request with the USPTO to divide this ITU.  As a result, the registration that issued in 2010 only covered "casino games and equipment therefor" and not the remaining goods in Class 28, such as lottery tickets.  (Defs.' 56.1 Stmt. ¶ 60; Pl.'s 56.1 Stmt. ¶ 60; Sloane Decl. Ex. 7.)

[5] The defendants also contend that the plaintiff does not own any valid rights to the trademark registrations in question because the ITU applications from which they matured were transferred to Gameologist by McGill pursuant to an improper assignment in gross.  (Defs.' 56.1 Stmt. ¶ 25.)  With respect to the 2005 registration, the defendants also claim that these trademark rights were fraudulently procured because there was no valid use in commerce of the specified goods.  (Tr. 3.)  However, because the plaintiff's registrations do not cover lottery tickets and thus do not provide presumptive or conclusive evidence of the mark's validity, it is unnecessary to reach the question of whether the plaintiff's registrations are valid.

one of the marks constitute conclusive evidence of the mark's validity, because "[s]uch conclusive evidence shall relate [only] to the exclusive right to use the mark on or in connection with the goods or services specified." Federal Express Corp. v. Federal Espresso, Inc., No. 97 Civ. 1219, 1998 WL 690903, at *10 (N.D.N.Y. Sept. 30, 1998) (Pooler, C.J.) (quoting 15 U.S.C. § 1115(b)), aff'd 201 F.3d 168 (2d Cir. 2000).

Because the plaintiff's registrations do not provide presumptive or conclusive evidence of the mark's validity, the plaintiff has the burden of proving that its mark is a valid trademark. See Reese Publ'g Co., Inc. v. Hampton Int'l Commc'ns, Inc., 620 F.2d 7, 11 (2d Cir. 1980); Columbia/HCA, 954 F. Supp. at 742; GMT Prods., L.P. v. Cablevision of N.Y.C., Inc., 816 F. Supp. 207, 210 (S.D.N.Y. 1993). The strength of a trademark in the marketplace and the degree of protection to which it is entitled are analyzed under four categories of marks that indicate increasing distinctiveness and protectability: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful. See Estee Lauder, 108 F.3d at 1508-09; Sports Auth., 89 F.3d at 961. Arbitrary or fanciful are sometimes described as separate categories. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). "A generic term is a common name . . . that describes a kind of product." Gruner + Jahr,

991 F.2d at 1075.  Generic marks are not protectable.  See id.
A descriptive mark is "one that tells something about a product,
its qualities, ingredients or characteristics."  Id. at 1076.
Descriptive terms are protectable only with evidence of
secondary meaning.  See id.  A suggestive mark suggests the
product, though it may take imagination to grasp the nature of
the product.  See id.  An arbitrary mark has an actual
dictionary meaning, but that meaning does not describe the
product, and a fanciful mark is a made-up name.  See id. at
1075-76; Jordache Enters., Inc. v. Levi Strauss & Co., 841 F.
Supp. 506, 515 (S.D.N.Y. 1993).  Suggestive, arbitrary, and
fanciful marks are eligible for protection without proof of
secondary meaning.  See Gruner + Jahr, 991 F.2d at 1075-76;
Thompson Med. Co., Inc. v. Pfizer Inc., 753 F.2d 208, 212-13 (2d
Cir. 1985).  Classification of a mark is a question of fact.
See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d
1033, 1039-40 (2d Cir. 1992).

     The parties agree that the mark "BLING BLING 2002" is
suggestive as applied to either gaming equipment or lottery
tickets.  The phrase "Bling Bling," when used in connection with
these goods, conveys some sense of the attributes of the product
but requires imagination and thought for the consumer to make
this connection.  See Lemme v. Nat'l Broad. Co., Inc., 472 F.
Supp. 2d 433, 444 (E.D.N.Y. 2007) ("A term is suggestive if it

requires imagination, thought and perception to reach a
conclusion as to the nature of goods. . . .  A term is
descriptive if it forthwith conveys an immediate idea of the
ingredients, qualities or characteristics of the goods."
(quoting Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73-74
(2d Cir. 1988))).  Thus, the mark "BLING BLING 2002" is
suggestive and is eligible for protection without proof of
secondary meaning.

     However, the defendants contend that the plaintiff has not
made sufficient use in commerce of the "BLING BLING 2002" mark
so as to entitle the mark to protection.  The right to exclusive
use of a trademark derives from the use in commerce of the mark,
rather than from the mark's mere adoption.  15 U.S.C. § 1125;
United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97
(1918).  The Lanham Act defines "use in commerce" as the "bona
fide use of a mark in the ordinary course of trade, and not made
merely to reserve a right in a mark."  15 U.S.C. § 1127.  "The
talismanic test is whether or not the mark was used in a way
sufficiently public to identify or distinguish the marked goods
in an appropriate segment of the public mind as those of the
adopter of the mark."  Int'l Healthcare Exch., Inc. v. Global
Healthcare Exch., LLC, 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007)
(internal quotation marks and citation omitted).

     Here, the plaintiff has presented only minimal evidence of

use in commerce of the mark "BLING BLING 2002."  The plaintiff
argues that it has made use of the mark through sales of its
board game; posting its interactive slot machine game online;
negotiations for license agreements; and advertising, marketing
and promotion of the mark.  These activities do not amount to
"use in commerce" sufficient to entitle the plaintiff's mark to
protection.  First, the plaintiff has only documented four sales
of its board game at approximately $30 each.  (Defs.' 56.1 Stmt.
¶¶ 31-32; Pl.'s 56.1 Stmt. ¶¶ 31-32; Sloane Decl. Ex. 16.)
While McGill testified that Gameologist sold about half of the
remaining 500 units to retailers, he was unable to provide
documentation of these transactions or of the proceeds derived
from these sales.  (McGill Dep. 153-57.)  In any event, de
minimis sales such as these are insufficient to demonstrate use
in commerce under the Lanham Act.  See La Societe Anonyme des
Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1272 (2d
Cir. 1974) (89 sales in 20 years amounted to "meager trickle of
business [that did not] constitute[] the kind of bona fide use
intended to afford a basis for trademark protection"); Major
League Baseball Props. v. Opening Day Prods., 385 F. Supp. 2d
256, 266 (S.D.N.Y. 2005) ($3000 in sales was de minimis and did
not indicate sufficient use to entitle the mark to protection);
Momentum Luggage & Leisure Bags v. Jansport, Inc., No. 00 Civ.
7909, 2001 WL 830667, at *6 (S.D.N.Y. July 23, 2001) (sale of 8

pieces of luggage for $760 insufficient to establish "use in commerce"), aff'd 45 Fed. Appx. 42 (2d Cir. 2002) (summary order).

Second, the advertising and promotion in which the plaintiff engaged was not sufficiently widespread or intensive to establish "use in commerce" under the Lanham Act.  See Housing & Servs., Inc. v. Minton, No. 97 Civ. 2725, 1997 WL 349949, at *4 (S.D.N.Y. June 24, 1997) (while advertising and promotion may be sufficient to establish use in commerce, such activities must be "open and notorious" or "of such a nature and extent that the [mark] has become popularized in the public mind" (citation omitted)); Windows User, Inc. v. Reed Bus. Publ'g Ltd., 795 F. Supp. 103, 109 (S.D.N.Y. 1992) ("Although advertisements and promotional activities may be relied on to demonstrate priority in use of a mark, this is the case only where it can be shown that such activity was of a nature and extent such as to create an association of the term with the user's goods." (internal quotation marks and citations omitted)).  Here, the plaintiff asserts that it attended trade shows and gaming expeditions, created prototypes of products, purchased an "email blast" announcing a "Bling Bling" casino game to the gaming industry, disseminated press releases, and took out advertisements.  (Pl.'s 56.1 Stmt. ¶ 78; McGill Dep. 34-35, 159, 265; Cassarino Dep. 56-60, 100, 106; Balestriere

Decl. Exs. Z, CA, DA.)  However, without providing evidence of
how widespread these efforts were and how wide an audience they
reached, the plaintiff has failed to raise a genuine issue of
material fact that this advertising and promotion was
sufficiently "open and notorious," Minton, 1997 WL 349949, at
*4, to qualify as use in commerce, see Int'l Healthcare, 470 F.
Supp. 2d at 372 (advertising and promotion insufficient to
demonstrate "use in commerce" for service mark where the
plaintiff networked at monthly trade meetings, was mentioned in
one industry periodical, and sent holiday cards to health care
industry conducts); Momentum, 2001 WL 830667, at *6 (fact that
the plaintiff advertised in a magazine, exhibited products at a
trade show and was mentioned in two trade journals did not
"constitute sufficient commercial promotion to establish common
law trademark ownership").

        The plaintiff has failed to raise a genuine issue of
material fact that its use of the mark "BLING BLING 2002" in
commerce has been anything but "sporadic, casual or transitory."
La Societe Anonyme, 495 F.2d at 1272.  Accordingly, the
plaintiff's mark is not entitled to protection and the
defendants are entitled to summary judgment on the plaintiff's
Lanham Act trademark infringement claim on this basis.[6]

---

[6] The defendants also contend that the plaintiff abandoned the
mark "BLING BLING 2002" in connection with lottery-related goods

B.

Moreover, the plaintiff's Lanham Act trademark infringement claim and false designation of origin and unfair competition claim fail because the plaintiff has not shown that the defendants' use of the term "bling" in connection with lottery tickets is likely to cause confusion.  To survive a motion for summary judgment, the plaintiff must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark," Gruner + Jahr, 991 F.2d at 1077; see also N.Y. Stock Exch. v. N.Y., N.Y. Hotel, LLC, 293 F.3d 550, 554-55 (2d Cir. 2002); Morningside Grp., 182 F.3d at 138; Estee Lauder, 108 F.3d at 1510, "or that there may be confusion as to [the] plaintiff's sponsorship or endorsement of the junior mark," Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 502 (2d Cir. 1996); see also Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108-09 (2d Cir. 2010); N.Y. Stock Exch., 293 F.3d at 555.  Proof of actual confusion is not necessary.  See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1227 (2d Cir. 1987),

---

and services.  A mark is considered abandoned under the Lanham Act "when its use has been discontinued with intent not to resume such use."  15 U.S.C. § 1127.  Because the plaintiff does not have a valid mark that is entitled to protection, there is no need to reach the question of whether the plaintiff abandoned an otherwise valid mark.

overruled on other grounds Bristol-Myers Squibb Co. v. McNeil-
P.P.C., Inc., 973 F.2d 1033, 1043 (2d Cir. 1992).  However,
proof of actual confusion is probative of likelihood of
confusion.  See Morningside Grp., 182 F.3d at 141.  The ultimate
question as to likelihood of confusion is a question of law for
the Court.  See, e.g., Sterling Drug, Inc. v. Bayer AG, 14 F.3d
733, 743 (2d Cir. 1994).  The question of likelihood of
confusion is appropriate for resolution on a motion for summary
judgment "where the undisputed evidence would lead only to one
conclusion as to whether confusion is likely."  Cadbury
Beverages, Inc. v. Cott Corp., 73 F.3d 474, 478 (2d Cir. 1996).

The plaintiff here alleges a likelihood of both forward
confusion and reverse confusion.  Forward confusion is the
traditional form of confusion in which the junior user uses the
mark to sell goods or services based on the misperception that
they originate with the senior user.  See Sterling Drug, 14 F.3d
at 740; Sunenblick v. Harrell, 895 F. Supp. 616, 625 (S.D.N.Y.
1995), aff'd 101 F.3d 684 (2d Cir. 1996).  "Reverse confusion
exists when a subsequent user selects a trademark that is likely
to cause consumers to believe, erroneously, that the goods
marketed by the prior user are produced by the subsequent user."
Lang v. Ret. Living Publ'g Co., Inc., 949 F.2d 576, 583 (2d Cir.
1991); see also Sterling Drug, 14 F.3d at 740-41; Troublé v. Wet
Seal, Inc., 179 F. Supp. 2d 291, 296 (S.D.N.Y. 2001);

Columbia/HCA, 964 F. Supp. at 743.  Reverse confusion also
"recognizes the danger that a junior user's products may tarnish
the image of the senior user's products or that consumers may
view the senior user as an unauthorized infringer of the junior
user's products, thus injuring the senior user's reputation and
impairing its good will."  SLY Magazine, LLC v. Welder Publ'ns
L.L.C., 529 F. Supp. 2d 425, 436-37 (S.D.N.Y. 2007) (citation
omitted), aff'd 346 Fed. Appx. 271 (2d Cir. 2009) (summary
order); see W.W.W. Pharm. Co., Inc. v. Gilette Co., 984 F.2d
567, 571 (2d Cir. 1993), superseded on other grounds by Deere &
Co. v. MTD Prods., Inc., 41 F.3d 39 (2d Cir. 1994); Sunenblick,
895 F. Supp. at 625-26 (collecting cases).[7]

    In Polaroid Corp. v. Polarad Electrics Corp., 287 F.2d 492
(2d Cir. 1961) (Friendly, J.), the Court of Appeals for the
Second Circuit set forth eight non-exclusive factors that courts
are to consider when determining whether a likelihood of

_____

[7] Some district court cases in this Circuit have held that, in a
reverse confusion case, a factual predicate to the claim is a
showing "that the junior user was able to swamp the reputation
of the senior user with a relatively larger advertising
campaign."  See THOIP v. Walt Disney Co., No. 08 Civ. 6823, 2011
WL 1792585, at *10 & nn.112, 114 (S.D.N.Y. May 10, 2011)
(collecting cases).  Other courts have held that the ability of
the junior user to swamp the reputation of the senior user is
not a factual predicate to a reverse confusion claim but is
rather relevant to analysis of the first Polaroid factor.  See
id. at 11 (citing Banff, Ltd. v. Federated Dep't Stores, Inc.,
841 F.2d 486, 491 (2d Cir. 1988)).  We consider the junior
user's ability to swamp the reputation of the senior user to be
most appropriately assessed, if at all, as part of the analysis
of the first Polaroid factor.

confusion exists.   Those factors are: 1) the strength of the

plaintiff's mark; 2) the similarity between the parties' marks;

3) the competitive proximity of the parties' products; 4) the

likelihood that the plaintiff will "bridge the gap" and offer a

product like the defendants'; 5) evidence of actual confusion

between the parties' products; 6) evidence of good faith on the

defendants' part; 7) the quality of the defendants' product; and

8) the sophistication of the relevant customers.   Id. at 495;

see also N.Y. Stock Exch., 293 F.3d at 555; Estee Lauder, 108

F.3d at 1510; Sports Auth., 89 F.3d at 960-65; Hormel Foods, 73

F.3d at 502-05.   The decision as to whether a mark infringes

requires a "comprehensive analysis of all the relevant facts and

circumstances."   Vitarroz Corp. v. Borden, Inc., 644 F.2d 960,

968 (2d Cir. 1981).   The Court of Appeals for the Second Circuit

has instructed that:

> [T]he Polaroid factors are not, of course, "exclusive" and
> should not be applied "mechanically." No single factor is
> dispositive, and cases may certainly arise where a factor
> is irrelevant to the facts at hand. But it is incumbent
> upon the district judge to engage in a deliberate review of
> each factor, and, if a factor is inapplicable to a case, to
> explain why.   The steady application of Polaroid is
> critical to the proper development of trademark law, for it
> is only when the Polaroid factors are applied consistently
> and clearly over time that the relevant distinctions
> between different factual configurations can emerge.

Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 400 (2d

Cir. 1995) (citations omitted); see also N.Y. Stock Exch., 293

F.3d at 555.   When the likelihood of confusion is in doubt, the

question will be resolved in favor of the senior user.  See Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 909 (3d Cir. 1952); Hearst, 248 F. Supp. 2d at 294; Caché, 2001 WL 38283, at *5-6; Lambert Pharmacal Co. v. Bolton Chem. Corp., 219 F. 325, 326 (S.D.N.Y. 1915 (L. Hand, J.)).


                                1.

     The "strength" of a mark is a measure of "'its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source.'"  Sports Auth., 89 F.3d at 960-61 (quoting McGregor-Doniger Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir. 1979)).  In gauging a mark's strength, a court must consider both the inherent distinctiveness of the mark and the mark's distinctiveness in the marketplace.  See Time, 173 F.3d at 118; W.W.W. Pharm., 984 F.2d at 572.

     In this case, the parties agree that the plaintiff's mark is suggestive.  Suggestive marks are inherently distinctive. See Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 385 (2d Cir. 2005).  However, apart from the inherent distinctiveness of the plaintiff's mark, the Court must also consider the distinctiveness of the mark in the marketplace. See Oxford Indus., Inc. v. JBJ Fabrics, Inc., No. 84 Civ. 2505, 1988 WL 9959, at *4 (S.D.N.Y. Feb. 2, 1988) ("A mark can be

conceptually strong . . . and at the same time be commercially weak if the mark lacks significance in the market place for identifying the origin of goods."). Although a suggestive mark is entitled to protection without a showing of secondary meaning, "suggestiveness is not necessarily dispositive of the issue of the strength of the mark" without a showing of secondary meaning. Lang, 949 F.2d at 581. Indeed, "[i]n the absence of any showing of secondary meaning, suggestive marks are at best moderately strong." Bacardi, 412 F.3d at 385.

In determining the distinctiveness of the mark in the marketplace, courts look to the well-established secondary meaning factors set forth in Centaur Communications, Ltd., 830 F.2d at 1222. These factors are: (1) advertising and promotional expenses; (2) consumer studies linking the mark to the source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use. Id. (citing Thompson Med. Co., 753 F.2d at 217).

Here, the bulk of the secondary meaning factors weigh heavily against the plaintiff. First, as described above, with respect to advertising and promotional expenses, the plaintiff asserts that it attended trade shows and gaming expeditions, paid to create prototypes of products, purchased an "email blast" announcing a "Bling Bling" casino game to the gaming

industry, distributed hundreds of samples of its board games, and disseminated press releases. (Pl.'s 56.1 Stmt. ¶ 78; McGill Dep. 34-35, 159, 265; Cassarino Dep. 56-60, 100, 106; Balestriere Decl. Exs. Z, CA, DA.) However, the plaintiff has produced no evidence as to the actual costs of these activities nor shown that they were anything but modest. See Centaur Commc'ns, Ltd., 830 F.2d at 1222 (concluding that $10,000 of expenditures was "modest"); Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 310 (S.D.N.Y. 2010) (advertising and promotional expenses of $35,720 over 5 years was relatively small); Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 345 (E.D.N.Y. 2007) (first secondary meaning factor did not favor plaintiff where plaintiff failed to show with specificity the amount of money spent to advertise the mark). Nor has the plaintiff shown that these promotional efforts have been successful in associating the "BLING BLING 2002" mark with the plaintiff in the minds of consumers. See Centaur Commc'ns, Ltd., 830 F.2d at 1222-23 (noting that the test of secondary meaning is not the amount of expenditures used to promote the mark but instead the resulting effectiveness of such efforts) (citation omitted). As a result, this secondary meaning factor weighs against the strength of the plaintiff's mark.

30

Second, there have been no consumer studies linking the "BLING BLING 2002" mark to the plaintiff or to any other source. (Defs.' 56.1 Stmt. ¶ 80; Pl.'s 56.1 Stmt. ¶ 80.)

Third, the plaintiff offers only minimal evidence of unsolicited media coverage. Cassarino testified that magazine articles were published about Gameologist, but it is unclear whether these articles were unsolicited or instead solicited by Gameologist as part of a promotional strategy. (Cassarino Dep. 100.) A press article announcing the release of the plaintiff's board game was also discussed during McGill's deposition, but it is similarly unclear whether the article was unsolicited or instead initiated by the plaintiff. (McGill Dep. 77). Counsel for the plaintiff also submits an affidavit stating that Gameologist had received correspondence from five media sources or gaming companies interested in the "Bling Bling" concept. (Balestriere Decl. ¶ 4.) However, the plaintiff submits no documentary evidence of any such correspondence or media coverage. This evidence is far short of the type of media coverage necessary for this secondary meaning factor to favor the plaintiff. See Advance Magazine Publishers, Inc. v. Norris, 627 F. Supp. 2d 103, 117 (S.D.N.Y. 2008) (hearsay evidence proffered through witness affidavit insufficient to demonstrate unsolicited media coverage without documentary evidence of such coverage in the record); National Distillers Prods. Co., LLC v.

Refreshment Brands, Inc., 198 F. Supp. 2d 474, 481 (S.D.N.Y.
2002) (unsolicited media coverage factor did not favor plaintiff
where it was clear that such coverage was, in part, in response
to efforts of public relations firm hired by plaintiff).  Thus,
this secondary meaning factor weighs against the strength of the
plaintiff's mark.

　　　　Fourth, the plaintiff has only proffered evidence of
minimal sales.  The only documented sales were for its board
games for recorded transactions totaling approximately $120.
(Defs.' 56.1 Stmt. ¶ 83; Pl.'s 56.1 Stmt. ¶ 83.)

　　　　Fifth, with respect to attempts to plagiarize the mark,
this factor is at best neutral for the strength of the
plaintiff's mark.  "Secondary meaning may be supported by
intentional copying, particularly when the purpose is to benefit
from the good will of the prior user through confusion."
Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp.
2d 217, 243 (S.D.N.Y. 2004) (internal quotation marks and
citations omitted).  The key question for purposes of this
factor "is whether the copying was done deliberately, so as to
benefit from [the plaintiff's] name and good will."  Id.  Here,
the defendants concede that they had knowledge of the
plaintiff's mark at the time they created the lottery tickets in
question.  (Tr. 6.)  However, there is no evidence that any
alleged copying by the defendants was done with the purpose of

"benefit[ing] from [the plaintiff's] name and good will."
Cartier, 348 F. Supp. 2d at 243.  To the contrary, the plaintiff
was not well-known in the lottery industry and had no reputation
or good will on which the defendants were likely to seek to
capitalize, given that the plaintiff has never successfully
marketed a product in the lottery industry and has only achieved
meager sales of its board game.  Moreover, the plaintiff has
submitted no evidence of other third-party attempts to
plagiarize the mark that would weigh in favor of a determination
of secondary meaning.  Thus, this factor is at best neutral for
the strength of the plaintiff's mark.

     Finally, with respect to the length and exclusivity of the
mark's use, the defendants have adduced evidence of significant
commercial use of the word "bling" in various industries.  They
submit a trademark search report for registered marks containing
the word "bling" that reveals more than 160 hits.  (App'x to
Defs.' Mem. of Law. in Supp. of Mot. for Summ. J.)  Given the
sheer number of marks that incorporate the word "bling,"
including marks in the entertainment industry, the plaintiff's
use of the phrase cannot be deemed exclusive.  See Air Cargo
News, Inc. v. Tabmag Publ'g, Ltd., No. 07 Civ. 480, 2007 WL
1101183, at *10 (E.D.N.Y. Apr. 11, 2007) (plaintiff failed to
demonstrate exclusivity of mark where at least five other
publications used the phrase "air cargo" in their title).

Moreover, the plaintiff has only been using the mark for a short period of time; it first posted the online slot machine game in 2004 and sold its first board game in 2007.  (Defs.' 56.1 Stmt. ¶¶ 19, 32; Sloane Decl. Ex. 5; Balestriere Decl. Ex. C.)  See Medici Classics Prods., 683 F. Supp. 2d at 310 (plaintiff's use of mark for seven years insufficient for this secondary meaning factor to support plaintiff).  This factor therefore weighs against the plaintiff.

Thus, while the plaintiff's mark is relatively strong conceptually, the secondary meaning factors weigh heavily against the plaintiff with respect to distinctiveness in the marketplace.  Accordingly, this Polaroid factor is at best neutral for the plaintiff.[8]

---

[8] Some cases suggest that, where the plaintiff alleges reverse confusion, it is appropriate to consider the strength of the junior user's mark, because the essence of such a claim is that the junior user overpowers the senior user's mark.  See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 231 (3d Cir. 2000); Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1130 n.5 (9th Cir. 1998); THOIP, 2011 WL 1792585, at *9 & n.101 (collecting cases); Sunenblick, 895 F. Supp. at 627-28.  But cf. W.W.W. Pharm., 984 F.2d at 573 (examining strength of senior user's mark in reverse confusion case, without discussing possibility that strength of junior user's mark is relevant); ImOn, Inc. v. ImaginOn, Inc., 90 F. Supp. 2d 345, 351 (S.D.N.Y. 2000) (same); Columbia/HCA, 964 F. Supp. at 744-45 (same).  The parties agree that the defendants' mark is a strong one.  Thus, if it were necessary to evaluate the strength of the junior user's mark in this case, the first factor in the Polaroid analysis would weigh in the plaintiff's favor.  However, that would not change the Court's ultimate conclusion on likelihood of consumer confusion after balancing all of the Polaroid factors.

2.

In considering the degree of similarity between the marks,
a court should address "two key questions:  (1) whether the
similarity between the two marks is likely to cause confusion
and (2) what effect the similarity has upon prospective
purchasers.  In deciding whether the marks are similar as used,
[a court does] not look just at the typewritten and aural
similarity of the marks, but how they are presented in the
marketplace."  Sports Auth., 89 F.3d at 962 (citation omitted).
The Second Circuit Court of Appeals has instructed that a court
must not engage in a mere side-by-side visual comparison of the
marks but "must analyze the mark's overall impression on a
consumer, considering the context in which the marks are
displayed and 'the totality of factors that could cause
confusion among prospective purchasers.'"  Malletier v.
Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d
Cir. 2005) (quoting Gruner + Jahr, 991 F.2d at 1078); see also
Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108,
117 (2d Cir. 2006).

The defendants' marks are visually dissimilar from the
plaintiff's.  While the marks bear some resemblance in their use
of the term "bling" and their depiction of diamonds (Sloane
Decl. Exs. 9, 15, 30; Balestriere Decl. Ex. O), there are also
considerable differences between the marks.  The defendants'

marks incorporate the term "bling" into phrases such as "It's a
Bling Thing," "Bling Me the Money," and "Spring Bling"
(Balestriere Decl. Ex. O; Sloane Decl. Ex. 30), rather than
using the term "Bling Bling" in isolation as the plaintiff's
marks do.[9]  (Sloane Decl. Exs. 9, 15.)  In addition, the marks
differ in the overall impression they convey to consumers.  The
advertisement for the plaintiff's board game labels itself "The
Ultimate Hustler's Game" and describes players as "adventurers
in an inner city setting trying to gather up money and
properties."  (Sloane Decl. Ex. 15.)  In addition, the
plaintiff's online slot machine game depicts photographs of
cars, scantily-clad women, and stacks of hundred dollar bills.
(Sloane Decl. Ex. 9.)  In contrast, the defendants' marks do not
appear to convey the image of a "hustler" and do not feature any
photographs of real images.  Instead, they depict drawings of
diamonds, flowers, butterflies, and, in one instance, a cartoon
of an anthropomorphized lottery ticket.[10]  (Balestriere Decl. Ex.

---

[9] The defendants did develop and print a lottery ticket for the
Belgium Lottery featuring the phrase "Bling Bling" in isolation
and proposed a "Bling Bling" lottery ticket to the Georgia
Lottery.  (Balestriere Decl. Exs. M, O.)  While these marks are
more similar to the plaintiff's, the plaintiff does not bring a
trademark infringement claim with respect to these marks and
therefore they should not be considered in the Polaroid
analysis.

[10] The fact that the lottery ticket is wearing sunglasses and a
large chain featuring a dollar sign creates an impression that
is closer to the "hustler" image that the plaintiff's board game

O; Sloane Decl. Ex. 30.)  Because the marks differ both visually
and in the overall impression they convey, this factor weighs
against the plaintiff.  See, e.g., Lang, 949 F.2d at 582
(products using identical terms were nonetheless dissimilar
because products' overall appearance conveyed different "general
impression" to public); Major League Baseball, 385 F. Supp. 2d
at 267 (degree of similarity between marks was low where both
products used phrase "opening day" but logos and other
depictions "convey[ed] a different impression" to the public).


                               3.

     In considering the proximity of the products, a court
should "consider whether the two products compete with each
other."  W.W.W. Pharm, 984 F.2d at 573.  The focus of the
product proximity inquiry is "the likelihood that customers may
be confused as to the [s]ource of the products, rather than as
to the products themselves . . . ."  McGregor-Doniger, 599 F.2d
at 1134, overruled on other grounds by Bristol-Myers Squibb Co.
v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1043-44 (2d Cir. 1992);
see also Arrow Fastener, 59 F.3d at 396; Hearst, 248 F. Supp. 2d
at 296.  In examining this factor a court should compare all
aspects of the products, including price, style, intended uses,

---

and online slot machine game appear to convey.  However, the
overall image presented by the defendants' tickets remains
largely dissimilar to the plaintiff's mark.

target clientele, typical distribution channels, and others.
See Hearst, 248 F. Supp. 2d at 296; Paco Sport Ltd. v. Paco
Rabanne Parfums, 86 F. Supp. 2d 305, 316 (S.D.N.Y. 2000), aff'd
234 F.3d 1262 (2d Cir. 2000) (table).  Direct competition
between the products is not necessary under this factor; it is
enough that the products are similar in nature or sold in the
same channels of commerce.  Virgin Enters. Ltd. v. Nawab, 335
F.3d 141, 150 (2d Cir. 2003).  However, "[w]hen the two users of
a mark are operating in completely different areas of commerce,
consumers are less likely to assume that their similarly branded
products come from the same source."  Id.

   Here, there is no evidence that the plaintiff's products
compete directly with those of the defendants.  While the
defendants produce instant lottery tickets and provide lottery-
related services for state lottery commissions, the plaintiff
has only produced a board game and an online slot machine game.
The plaintiff has never successfully marketed a product to or
produced a product for a state lottery commission.  Nor is there
any evidence that the plaintiff's products, while not in direct
competition with the defendants', were marketed to a similar
clientele or sold in the same distribution channels.  The
defendants sold their products exclusively to state lottery
commissions, which were not the target clientele for the
plaintiff's board game or online slot machine.  Thus, no

reasonable jury could find that the parties' marks compete in the same industry, and this factor weighs against the plaintiff.

4.

"Bridging the gap refers to the 'senior user's interest in preserving avenues of expansion and entering into related fields.'" Hormel Foods, 73 F.3d at 504 (quoting C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14, 18 (2d Cir. 1985)).  This factor involves a determination of the likelihood that the plaintiff will enter the defendants' business or of the average customer's perception that the plaintiff would enter the defendants' market.  See Sports Auth., 89 F.3d at 963; Hearst, 248 F. Supp. 2d at 297.

In this case, the plaintiff has not demonstrated any likelihood that it will enter the lottery industry or that an average consumer would think it likely that it could do so. While the plaintiff's solicitations of state lottery commissions and licensing negotiations do indicate its desire to enter into the lottery industry, "the intent of the prior user to expand or its activities in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion." Lang, 949 F.2d at 582 (citations omitted).  In this case, the average consumers of the defendants' products are state lottery commissions.  There is no evidence here that it

39

would be reasonable for these average consumers to assume that
the plaintiff would enter into the lottery industry.  To the
contrary, despite the plaintiff's efforts, the plaintiff's
solicitations of state lottery commissions have been rejected
and it has never licensed its mark to a third party other than
MDI in connection with lottery-related goods.  Thus, because no
genuine issue of material fact exists as to whether the
plaintiff is likely to expand into the lottery industry or
whether the average consumer would think it likely that the
plaintiff would do so, this factor weighs against the plaintiff.

5.

"For purposes of the Lanham Act, actual confusion means
'consumer confusion that enables a seller to pass off his goods
as the goods of another.'"  Sports Auth., 89 F.3d at 963
(quoting W.W.W. Pharm., 984 F.2d at 574).

The plaintiff has presented no evidence of actual
confusion, other than anecdotal, hearsay evidence of confusion
on the part of friends and family members of Gameologist's
current or former members.  (McGill Dep. 268-69; Cassarino Dep.
364-67.)  This does not suffice to raise a genuine issue of
material fact as to consumer confusion, especially given that
this inquiry focuses on the consuming public as a whole, not
interested parties already familiar with the plaintiff's mark

through personal connections.  See Bacardi, 412 F.3d at 387-88
(giving little weight to plaintiff's evidence of actual
confusion that consisted only of "testimony by several
interested witnesses, recounting a handful of anecdotes,
including a number of hearsay statements").  The plaintiff also
points to a letter from the Florida Lottery rejecting an
unsolicited proposal for a "Bling Bling" lottery ticket sent by
the plaintiff.  (Cassarino Dep. 362; Sloane Decl. Ex. 25.)
However, the letter explains the Lottery's policy of not
accepting unsolicited proposals.  (Sloane Decl. Ex. 25.)  It
does not indicate that the Florida Lottery was confused about
the origin of the plaintiff's ideas.  Thus, the plaintiff has
failed to raise a genuine issue of material fact as to actual
confusion and this Polaroid factor weighs against the plaintiff.


                               6.

     "Bad faith generally refers to an attempt by a junior user
of a mark to exploit the good will and reputation of a senior
user by adopting the mark with the intent to sow confusion
between the two companies' products."  Bacardi, 412 F.3d at 388.
As discussed above, the plaintiff has presented evidence that
the defendants were aware of the plaintiff's mark before they
created the lottery tickets in question.  However, the "only
relevant intent is intent to confuse.  There is a considerable

                               41

difference between an intent to copy and an intent to deceive." Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 117 (2d Cir. 2009) (quoting 4 McCarthy on Trademarks § 23.113); see also Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 745 (2d Cir. 1998) ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product."). While an intent to copy will often give rise to an inference of intent to confuse, see Paddington Corp. v. Attiki Imps. & Distrib., Inc., 996 F.2d 577, 586-87 (2d Cir. 1993), this inference logically would be weakened where the defendant would derive no benefit from sowing confusion as to the source of the product, such as where the plaintiff has no good will or reputation on which the defendant could hope to capitalize. In this case, as discussed above, the plaintiff has no reputation or good will on which the defendants could attempt to trade. This weighs heavily against an inference that the defendants acted in bad faith. See Major League Baseball, 385 F. Supp. 2d at 268 (lack of evidence of "any reputation or goodwill" upon which the defendant "could possibly have hoped to capitalize" weighed against finding of bad faith).

Moreover, the fact that the defendants sought out and relied upon the advice of counsel concerning the availability of the mark for use weighs against an inference of bad faith.

<u>Bacardi</u>, 412 F.3d at 388; <u>Lang</u>, 949 F.2d at 583.  The
defendants' legal department conducted trademark searches for
each of the marks featured on the lottery tickets at issue in
this case and concluded that each mark was available for use.
(Defs.' 56.1 Stmt. ¶ 112; Pl.'s 56.1 Stmt. ¶ 112; Sloane Decl.
Exs. 32-35.)[11]  While two trademark searches referred to the
plaintiff's mark, both letters concluded that no likelihood of
confusion existed between the plaintiff's mark and the mark that
the defendants intended to use.  (Sloane Decl. Exs. 33, 35.)
The defendants' actions in seeking and relying on the advice of
counsel support a finding of good faith.  Thus, this <u>Polaroid</u>
factor is at best neutral for the plaintiff.

7.

     The analysis of the quality of the defendants' product "is
primarily concerned with whether the senior user's reputation
could be jeopardized by virtue of the fact that the junior
user's product is of inferior quality."  <u>Arrow Fastener</u>, 59 F.3d
at 398.  "Generally, quality is weighed as a factor when there
is an allegation that a low quality product is taking unfair

---

[11] While the parties' Rule 56.1 Statements agree that the
defendants have produced clearance letters indicating trademark
searches for each of the lottery tickets at issue, the Court
notes that the defendants have only submitted trademark
clearance letters for four of the five lotteries in question.
(Sloane Decl. Exs. 32-35.)

advantage of the public good will earned by a well-established high quality product." Gruner + Jahr, 991 F.2d at 1079. When there is no difference in the quality of the products, the factor should thus be treated as neutral rather than as weighing in favor of the defendants. SLY Magazine, LLC v. Weider Publ'ns LLC, 346 Fed. Appx. 721, 723 (2d Cir. 2009) (summary order).

The parties do not dispute that the defendants generally produce high quality goods and services for state lottery commissions. (Defs.' 56.1 Stmt. ¶ 113; Pl.'s 56.1 Stmt. ¶ 113.) However, the plaintiff argues that the "Ba-Da-Bling" ticket produced for the New York Lottery was of questionable taste in that it could be perceived as offensive to Italian Americans and African Americans. Even crediting the plaintiff's opinion, this is not enough to raise a genuine issue of material fact that the plaintiff's reputation would be injured by any inferior quality of the defendants' products. Thus, because there is no genuine issue of material fact that the defendants' products tarnish the reputation of the plaintiff, this factor is neutral.

8.

In considering the sophistication of consumers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in

buying that class of goods . . . ." McGregor-Doniger, 599 F.2d
at 1137 (quoting R. Callman, The Law of Unfair Competition,
Trademarks and Monopolies § 81.2, at 577 (3d ed. 1969)); see
also Sports Auth., 89 F.3d at 965; W.W.W. Pharm., 984 F.2d at
575.  In general, greater sophistication of consumers reduces
likelihood of confusion.  See Centaur Commc'ns, Ltd., 830 F.2d
at 1228.

Here, the relevant consumers are state lottery
commissions.[12]  Neither party disputes that these commissions
exercise a high level of sophistication in selecting suppliers
of instant lottery tickets.  (Defs. 56.1 Stmt. ¶ 115; Pl.'s 56.1
Stmt. ¶ 115.)  Thus, this factor weighs in favor of the
defendants.


9.

The Polaroid factors must be weighed as a whole and this
process is not a "mechanical process."  Arrow Fastener, 59 F.3d
at 400; see also Sports Auth., 89 F.3d at 965.  Here, the
strength of the mark and the good faith of the defendants are at
best neutral for the plaintiff.  The quality of the defendants'
mark is also neutral.  However, the rest of the factors weigh

---

[12] While the plaintiff appeared to dispute this issue in its
moving papers, counsel for the plaintiff stated at oral argument
that state lottery commissions were the relevant consumers and
conceded that this factor weighed against the plaintiff.  (Tr.
27.)

heavily against the plaintiff.  There is a low degree of
similarity between the parties' marks.  Moreover, there is no
evidence of any competitive proximity between the parties' marks
nor that the plaintiff is likely to bridge the gap.  There is
also no evidence of actual confusion among consumers, and the
relevant consumers are highly sophisticated.  Consequently, the
plaintiff has failed to raise a genuine issue of material fact
as to likelihood of confusion and the defendants' motion for
summary judgment dismissing the plaintiff's Lanham Act trademark
infringement claim and false designation of origin and unfair
competition claim is **granted.**


### IV.

The defendants also move for summary judgment dismissing
the plaintiff's false advertising claim under Section
43(a)(1)(B) of the Lanham Act.

Section 43(a) of the Lanham Act protects against the use of
any word, term, name, symbol or device that "in commercial
advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her
or another person's goods, services, or commercial activities."
15 U.S.C. § 1125(a)(1)(B).  A plaintiff may establish a false
advertising claim under either of two theories: "(1) the

advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." <u>S.C. Johnson & Son, Inc. v. Clorox Co.</u>, 241 F.3d 232, 238 (2d Cir. 2001) (citations omitted); <u>see also</u> <u>Tiffany (NJ) Inc. v. eBay Inc.</u>, 600 F.3d 93, 112 (2d Cir. 2010).  In addition, the plaintiff must "demonstrate that the false or misleading representation involved an inherent or material quality of the product." <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 153 n.3 (2d Cir. 2007).

Here, the plaintiff does not claim that the defendants' advertisements are literally false but rather that they are likely to deceive or confuse consumers about the origin and ownership of the mark used in the defendants' lottery cards.  In order to demonstrate that an advertisement is likely to deceive or confuse customers, a plaintiff must produce some extrinsic evidence of such consumer deception or confusion, even at the summary judgment stage.  <u>Tiffany</u>, 600 F.3d at 112-13; <u>New Sensor Corp. v. CE Distrib. LLC</u>, 121 Fed. Appx. 407, 409 (2d Cir. 2004) (summary order); <u>Time Warner Cable</u>, 497 F.3d at 153.  Here, as discussed above, there is no evidence of actual confusion regarding the ownership or origin of the defendants' marks.

Thus, the defendants' motion for summary judgment dismissing the plaintiff's false advertising claim is **granted.**[13]

## V.

The defendants also move for summary judgment dismissing the plaintiff's New York common law claims of unfair competition, passing off, breach of contract, unjust enrichment, and quantum meruit.  Each of these claims is considered in turn.

## A.

The defendants move for summary judgment dismissing the plaintiff's state-law unfair competition claim.  Under New York law, "[t]he essence of unfair competition . . . is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'"  Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34 (2d Cir. 1995) (quoting Rosenfeld v. W.B. Saunders, 728 F. Supp. 236, 249-50 (S.D.N.Y. 1990)).

Here, the plaintiff's unfair competition claim must fail. The plaintiff has failed to demonstrate any triable issue of

---

[13] The defendants also claim that the plaintiff does not have standing to bring a false advertising claim under the Lanham Act.  Because the plaintiff has failed to raise a genuine issue of material fact as to the required elements of the claim, there is no need to reach this question.

fact with respect to the likelihood of confusion between the marks, which is a required element of this claim.  Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's state-law unfair competition claim is **granted**.


                                   B.

     The defendants also move for summary judgment dismissing the plaintiff's state-law passing off claim.  New York courts "have long recognized two theories of common-law unfair competition: palming off and misappropriation."  ITC Ltd. v. Punchgini, Inc., 880 N.E.2d 852, 858 (N.Y. 2007).  Palming off, or passing off, is "the sale of the goods of one manufacturer as those of another."  Id.  "The gravamen of an unfair competition claim for 'palming off' is that the labors and expenditures of the plaintiffs have been misappropriated by the defendants, and are likely to cause confusion among the purchasing public as to the origin of the product."  Bristol-Myers Squibb Co. v. McNeil-P.P.C., 786 F. Supp. 182, 216 (E.D.N.Y. 1992), aff'd in part, vacated in part 973 F.2d 1033 (2d Cir. 1992).

     In this case, as explained above, the plaintiff has failed to raise a triable issue of fact with respect to likelihood of confusion regarding the origin of the defendants' products.  Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's passing off claim is **granted.**

C.

The defendants also move for summary judgment dismissing the plaintiff's breach of contract claim.  The required elements for a breach of contract claim under New York law are: "(1) formation of a contract between the parties; (2) performance by plaintiff; (3) defendants' failure to perform; and (4) resulting damage."  Castorino v. Citibank, N.A., No. 07 Civ. 10606, 2008 WL 5114482, at *2 (S.D.N.Y. Dec. 5, 2008) (citations omitted). To maintain such a claim, a plaintiff must allege that the defendant was a party to the contract at issue.  See Leber Assocs., LLC v. Entm't Grp. Fund, Inc., No. 00 Civ. 3759, 2003 WL 21750211, at *15-16 (S.D.N.Y. July 29, 2003).

The plaintiff claims that the defendants breached the license agreement it entered into with MDI by producing and printing lottery tickets that featured the plaintiff's mark. However, the defendants were not a party to the agreement between the plaintiff and MDI.  In fact, the license agreement explicitly states that MDI is a subsidiary of Scientific Games International.  (Sloane Decl. Ex. 20 at 1; Balestriere Decl. Ex. H at 1.)

The plaintiff attempts to avoid this conclusion by arguing that, when the defendants acquired MDI in 2003, the defendants became MDI's "successor."  Generally, one corporation is the successor of another when, "by a process of amalgamation,

50

consolidation or duly authorized legal succession, [it] has assumed the burdens of the first corporation." In re Murray Realty Co., 35 F. Supp. 417, 419 (N.D.N.Y. 1940) (citation omitted).  The term successor "does not contemplate acquisition by ordinary purchase from another corporation." Id. (citation omitted).  Here, the plaintiff has adduced no evidence to suggest that Scientific did anything but acquire MDI by ordinary purchase.  Instead, the plaintiff admits that MDI is technically a subsidiary of Scientific but asserts that it acts more like a department of Scientific.  This appears to be an effort to pierce the corporate veil, but the plaintiff has not provided sufficient evidence to justify doing so.  To pierce the corporate veil, New York law "requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. N.Y. State Dep't of Taxation & Fin., 623 N.E.2d 1157, 1160-61 (N.Y. 1993).  Here, the only evidence the plaintiff cites to support veil piercing is that MDI and Scientific are both in the lottery industry and that many employees of MDI have gone to work for Scientific.  This does not suffice to justify piercing the corporate veil.  Thus, there is no genuine issue of material fact that the defendants were not parties to the license

51

agreement between MDI and the plaintiff.  Because a viable

breach of contract claim requires that the defendant be a party

to the contract at issue, the defendants' motion for summary

judgment dismissing the plaintiff's breach of contract claim is

**granted**.[14]


D.

The defendants also move for summary judgment dismissing

the plaintiff's unjust enrichment and quantum meruit claims.

Under New York law, quantum meruit and unjust enrichment claims

may be considered together as a "single quasi contract claim."

Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host

Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citation omitted).  "To

prevail on a claim of unjust enrichment, a party must show that

_____

[14] The defendants have also raised other defenses to the breach
of contract claim, namely that the claim is time-barred, that
the agreement was not breached but instead mutually cancelled,
and that the plaintiff did not have a valid trademark at the
time of the agreement because it had not yet used the mark in
commerce.  Because the defendants were not parties to any
contract allegedly breached, there is no need to reach these
arguments.  The plaintiff also appears to allege that the
defendants fraudulently induced it to cancel the agreement by
providing false information that state lottery commissions were
not interested in the plaintiff's mark.  (Second Am. Compl. ¶
121.)  However, the plaintiff alleges only that MDI, rather than
the defendants, made these misrepresentations.  Thus, to the
extent that the plaintiff asserts a separate fraudulent
inducement claim, this too must fail.  In addition, there is no
evidence that any representation was false when made.  There was
a lapse of over three years between the termination of the
license agreement and the sale of lottery tickets using the term
"bling" by the defendants.

(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Old Republic Nat'l Title Ins. Co. v. Luft, 859 N.Y.S. 2d 261, 262 (App. Div. 2008).  To recover in quantum meruit, the plaintiff must show: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000).

Both claims must fail here because there is no evidence that the plaintiff provided anything of value to the defendants or that the defendants accepted services from the plaintiff. The plaintiff contends that the defendants accepted privileges and benefits associated with the MDI license without compensating the plaintiff.  While the plaintiff has presented some evidence that the defendants knew of the plaintiff's mark when they created the lottery tickets in question, the plaintiff has failed to raise a genuine issue of material fact that the defendants appropriated something to which they were not entitled.  This is because, as discussed above, the plaintiff did not have a valid mark that was entitled to protection against any alleged copying by the defendants.  Accordingly,

summary judgment is **granted** dismissing the plaintiff's unjust

enrichment and quantum meruit claims.

### CONCLUSION

The Court has considered all of the arguments of the

parties.  To the extent not specifically addressed above, the

remaining arguments are either moot or without merit.  For the

foregoing reasons, the defendants' motion for summary judgment

is **granted** with respect to all of the plaintiff's claims.  The

Clerk is directed to enter Judgment in accordance with this

Opinion and to close this case.  The Clerk is also directed to

close all pending motions.


**SO ORDERED.**

**Dated:**     **New York, New York**
          **October 25, 2011**


                                         John G. Koeltl
                                    United States District Judge